Good morning, Your Honors. Andre Boghossian representing the petitioners, Mr. and Mrs. Kevlishvili. Your Honor, this is a case that was denied by the BIA, I would say, in August 6 of 2012. I would like to reserve about two minutes for rebuttal, if possible. Just watch the clock. It counts down. Okay. Thank you very much, Your Honors. Thank you. Your Honors, petitioners came to the United States in 2003. They applied for asylum in 2004, and their case was heard in court in 2010. The merits hearing ended, which is important, in November 8 of 2010. And at the end of the merits hearing, as you can also see in the government's brief and also the record, the immigration judge says that I am inclined, and I'm probably inclined, to grant this case. Just go home. We'll wait for the biometrics, and then we'll decide. On December 29, about a month and a half later or a little more than that, the judge issued a written decision. We never went back to court. And in his written decision, the judge found many, many reasons to believe that the petitioner was not credible and denied the case. We have a problem with this, Your Honor. We believe that the reasons found by the judge are not major reasons. They do not go to the heart of the matter, and they do not support an adverse credibility finding, which I'll go through some of these issues, and I'll explain why I believe that. But most importantly, Your Honor, is that the judge at the time when he made that statement was in the best position to make a decision. I'm afraid I can't rule for you simply on the basis that the judge changed his mind. Yes, no, I understand. But it's important to realize that at the time when the judge said that, the judge had freshly observed the petitioner testify. He had seen his demeanor. He had seen how the petitioner moves his hands when he's talking about the opposition. He had seen how he breathes. He had seen how he stops breathing when he talks about the death of his son. That's why the judge agreed that the petitioner is credible. Now, after that, all those were lost. Those were important evidence in my client's case. His demeanor, his attitude, the way he moved, the way he breathed, the way he looked at the judge made a lot of difference, Your Honor. Yeah. Could you talk about the specifics of the case? Yes. Specifically, the judge came back and said that there are a few problems with the case and that my client is not credible. One of the issues was regarding when he was beaten at his workplace and that he said that he was slapped and his secretary or employee was slapped, too. Supposedly, in the written statement, it says that there were three people who were slapped. And the judge says, well, you only mentioned that after we asked you, but this is not a major inconsistency, we believe, that would make my client not to be credible. After he was asked, without being given any clues, he did say, yes, there was a third person who was a truck driver who was also slapped. In addition to that, then he continued giving names and more description. Let me go back to that. As I read his testimony, he says that my secretary and I were there. We were slapped, or maybe just she was slapped, and then the truck driver was slapped. Yes. And then in the statement, I refused and my two employees and I were beaten. Tell me about the translation part. Obviously, he's not writing this in English. Somebody else is writing this in English as a narrative. That's correct, Your Honor. At an early stage when we're having the testimony, we're told that there are two translators, one from Georgian to Russia, and then from Russian to English. Then there's an interruption and there's a resumption of the hearing at some later time. Does that same translation, sort of two-layer translation, continue throughout? No, I believe a translator was changed. The Russian translation was changed and then a Georgian translator was used. I'm sorry. Go ahead. So when the hearing resumes, we have someone who's simply able to translate between Georgian and English? Yes, Your Honor. Okay. That's my understanding. So it's just the first half that has that two layers. Yeah. That's my understanding, Your Honor. Let me, because time is the enemy here, let me tell you which of these credibility findings is most concerning to me. And that has to do with the death of son Anthony. It just seems unbelievable to me that your client would not have a clear recollection of the circumstances surrounding his son's murder. These other issues, you know, I can sort of take with a grain of salt, but as to that one, I really am troubled by that. I understand, Your Honor, but you should also realize that at the time when the judge saw these inconsistencies, the judge confronted my client in a courtroom. And when my client was able to explain, and as the judge observed my client's demeanor, the judge came back and said, actually, although there are some problems that I see, I believe that he's saying the truth. He says he discovers his son's body at one point in time. Then he says he didn't encounter his son's body until he got to the morgue. I mean, these are, you would think in terms of the death of your own son, you'd have a clear recollection as to what happened. Well, Your Honor, first of all, until we are put in a position like that, I cannot tell you whether I would remember everything if my child is killed, because that would be a very traumatic situation and we may lose some memory. We may see things differently today and see them differently eight years or ten years before when the incident took place. You wouldn't remember where you first saw your son's dead body? That's the issue. I don't think that's what happened. There were two problems. One, the judge says that we don't believe your son's body. You said that your son's body was found in a ditch and then your statement says it was found by a river. Back of a river. Okay. So a ditch and a river in a city where he lives, where everyone is a farmer, may be the same, Your Honor. A ditch, bank, I get that. But ditch, bank, river versus encountering his son's body first in the morgue, I mean, that's completely two different concepts. I agree with you, but let me please explain. The morgue situation was this way, Your Honor. Petitioner indicated there was a confusion as to whether Petitioner saw the son's body first at the morgue or he took the body to the hospital. But he was never given the opportunity to explain whether the morgue and the hospital were even the same, you see. But he did go on and explain the situation. Can I provide an answer that you so far have not provided? I just want to read from the transcript on page 214, and the government may want to read along with me. This is now the petitioner, the asylum seeker, testifying with respect to the son. I went to Lago Dei to see because my son was detained from night prior. So what I find is my son dead in a ditch, and the pastor was passing by. Not a pastor, but a person was passing by and saw. When I went to Lago Dei, they didn't even tell me anything. I did not know anything. I was told what happened, that he was found dead. That strikes me as an elision or a summary at that first part when he says, So what I find is my son dead. Well, in the same paragraph, he says, I was told what happened, that he was found dead. I do not read that first sentence as him saying, I saw him there dead on the ditch. I think that's a translation difficulty or maybe a sort of figure of speech. I find that my son is dead, meaning I discover. I do not think he said first within the space of three or five lines that I saw him dead and that I didn't see him dead. I think he said, I find out that my son is dead. But he very clearly says, I was told what happened, that he was found dead. Your Honor, it seems that the immigration judge agrees with you because he said that petitioner was emphatic and his demeanor was pretty convincing that the statement was wrong and he was telling us the truth. That's regarding the son, that he first seen his son's body at the morgue. That's the record on page 311, Your Honor. So it seems that the judge agrees with you that although there may be some inconsistencies, it may be because of translation errors or something less, but at least his explanation was good enough for the judge to agree and to believe that he's assertive, that he's clear, that he's saying the truth. Now, I can't remember. Was this the earlier hearing or the later hearing? Did we have one or two translators at this time? I am not sure, Your Honor. I did not think that would be an issue. I can go back and look. Yes. To the extent it makes a difference. Your Honor, since my time is almost up, Your Honor, I would like to let the Court know that our position is that there may be some inconsistencies in this matter, but none of them go to the heart of the matter. None of them are important enough to make the petitioner not a credible person. And although the judge has absolutely the right to change his mind or her mind afterwards when looking at the records, the judge never mentioned anything about my client's demeanor in the courtroom when he was making his decision. It seems to me that he systematically went through sentence to sentence and came to the conclusion that my client is inconsistent. And you could see that in two areas where the judge and the BIA mentioned only a portion of my client's testimony, Your Honor, and not the entire testimony. And that is in my argument. If you would like, I could mention them, but it seems to me that my brief has it explained. Why don't you mention it right now because that will give a chance to the government to respond. Okay. When it comes to the arrest of May 8, 2003, Your Honor, the judge said that basically he's being inconsistent because he says 40 or 50 people were arrested, but his statement says only a few party members were arrested. But in reality, this is what the judge and the board ignored, Your Honor, is that the entire sentence should have been read. It says police arrested a few active members of our party, including my son, Alexander, and some peaceful village residents. So when you look at this, you see that the judge does not use the entire sentences in his oral testimony or in his written statement, Your Honor. Judge chooses portions of his testimony, Your Honor, and comes to conclusion. Then there was one other. There is one more, Your Honor. I have to look it up, unfortunately. Yes. When it comes to his speech of March 2003, and he indicated that, you know, everyone had a speech and I had a speech too, and the judge confronted him saying, well, in your statement you don't say that you had a speech. And the judge came back to say his only explanation was that it should have been there. But that was not the entire sentence. I'm going to read the entire sentence which he said, it should have been there because I was voicing my view and making speeches everywhere that there was a meeting. Every time, even if there was like 10 people, I would, you know, make speeches for, to convince people to let them see the right way for the country and the government and to vote for me. So this is an entire statement. Page of the AR. 216, Your Honor. Okay. Got it. But in his decision, the judge says he only said it should have been there. Okay. Got it. Let's hear from the government. Thank you, Your Honor. Yes, Your Honor. Thank you. Thank you. Thank you, Your Honor. Good morning. We know who you are, but just for the record, your name again. Okay. Lindsey Corliss for the respondent. Okay. So this is a pre-Real ID Act case. And again, we ask that this court deny the petition for review and uphold the agency's decisions denying asylum, withholding of removal, and cap protection. Now, this case has been heard three different times, first by an asylum officer, then by an immigration judge, then by the Board of Immigration Appeals. That means it's been heard in the ordinary way. It has. That does not take it out of the ordinary. Okay. So the board in this case based its adverse credibility finding on four inconsistencies, and I'll discuss each in turn. Okay. The first petitioner was inconsistent regarding a December 2002 extortion attempt by three men. So petitioner submitted a narrative statement in which he stated that these three men came to his office and beat him and his two employees up, and that following that incident, he filed a police report, but that report was ignored. However, during testimony, petitioner testified that these men came to his office and beat him and his secretary, and only when pressed on whether it was just he and his secretary, that's when he stated there was also a truck driver who was also slapped. Tractor driver. I'm sorry. Tractor driver who was also slapped. How is that inconsistent? I get to three both times. Right. Well, he never stated that this tractor driver was his employee and slapped and beat him. Was he asked if the tractor driver was an employee? He was not. An omission. And my understanding from his testimony is he's got a machine repair shop and he's also leasing land on which he is farming. So a tractor driver, as distinct from a truck driver, that sounds as though that may be somebody who works for him. Certainly that's a plausible explanation. However, what we're looking for here is compelling evidence. That's the standard. I'm looking for compelling evidence to support the adverse credibility finding, and so far I'm not there. Okay, so I will move on then. So perhaps more troubling, though, is what he described in the aftermath of this event. He stated that he reported this to the police and that that report was ignored. However, when he testified regarding this incident, he said that he reported it to the police, and instead of ignoring it, the police actually came back, threatened him with death, and said that if he didn't withdraw the complaint, that they would kill him. This is certainly a substantial embellishment because it's talking about a material element of his claim, the police involvement. Although this is weird, usually we get a written statement that's made prior to the oral testimony. And if we get oral testimony embellishing the written statement, we're suspicious of it because all of a sudden your story got better. Right. But in this case, he testifies first, and this narrative comes later. Isn't that right? No, the narrative was actually submitted. It's on page, I think it's 93 of the record. So that's at the very beginning of the April 26, 2005 hearing. So he did submit this narrative in advance. The narrative does come first. Yes, it does. Okay, so when he says, I realize I didn't tell it enough. He's talking about the interview with the asylum officer. Yes. I got it. Okay. Yes, and then so he is submitting this narrative statement ahead of his testimony. I got it. So it's again in the normal course. Yes. So that does represent a substantial embellishment because it's talking about the police rather than just ignoring something, actually coming forth and actively threatening him with death. The second inconsistency regards a March 2003 political meeting at a soccer stadium. Petitioner testified that certain individuals, including his son and the party leader, had made speeches at this event that ultimately was broken up by police who beat many of the attendees there. However, when he testified regarding this incident, he again embellished his own political involvement by stating that he himself made a speech. Since this was a central element of his claim because it deals with the police action against individuals who have this political opinion, it does go to the heart of the claim. The third inconsistency dealt with the- I kind of missed this one. So tell me again what the inconsistency is. Petitioner stated in his narrative statement that his son Alexander and the political leader of his party made speeches at this event. However, when he testified regarding the event- Okay, I've got the narrative in front of me. So tell me where in the narrative we're talking about this. In the narrative statement? Yeah, I've got it in front of me. So it's the March 2003 incident. Okay. Sorry, I don't have it right, that exact part right in front of me. But it would have been- It's on the second page of his narrative statement. Yeah, I've got it. He says- I'm sorry, I can't pronounce the name of his political party leader. But that's listed as well as his son Alexander as speakers. So about 2,000 people came to the meeting. Our-I don't know how to pronounce it either- Rumashvili, Mindeli, and other members of our party made speeches. Among the speakers was my son who was dispersed with batons. And so you're saying, well, he's embellishing because in his narrative statement he says he's talking to. Well, when he-no, his testimony. His testimony, he then says, I'm talking to, but he omitted it from the written narrative.  Okay, so it's an embellishment. An embellishment, correct. Got it. Okay, I'm with you. So then the third inconsistency regards the May 2003 arrests. Madam Counsel? Yes. Before you go on to that, on that last one, did he say whether he was giving a speech to the whole crowd? You know, like the featured speakers? Or could he have been just saying he's making comments to the people around him and so on? He said that each of the speakers was given five minutes and that he himself spoke for the five minutes. So, no, he does not explicitly state that, you know, he was-that this was like a main event, but certainly the implication is that it was a formal he had five minutes to give a speech, that kind of thing, rather than just talking to people. Thank you, that's helpful. Okay, so show me now in the transcript his discussion of his speaking, would you please? Okay. And I realize this may take you over, but this is important enough. I think we better make sure we got it down to-down precisely. Okay, so he's-so on page 210 of the record- Okay, I'm with you. He says, okay, what happened-what happened that, you know, during that time the political leader made that statement? There were also-and then he names other people who made a statement. And then he said, I made the statement, even my child, my son made the statement. So where-what line are you on? Oh, this is right at the top of the very first paragraph of page 210. Oh, I made the statement, okay. They do discuss the fact that-so down on the bottom of page 211, probably about four lines up from the bottom, they specifically confront him with that inconsistency. Yeah. So, yes, everybody at time limit like kind of-I did make a speech, too. Okay, so it's not totally inconsistent with the written narrative, but it certainly specifically mentions he made a speech himself for five minutes in the testimony, which he'd not told us in the written narrative. That's correct. Okay, I got it. If I may go on to the third-the third inconsistency. Now, this involves the May 2003 arrests. These arrests were particularly important because they were the arrests that actually led to his son's death. So they were quite significant in his claim. He submitted in his statement that a few active members of his party and some of the villagers had been arrested on that day. He then testified that 40 to 50 individuals had been arrested during his testimony. While Petitioner now, in his statement to this court and in his brief, has argued that this makes sense because as a percentage of the population of the village, plus the active participants in the party, that that together would seem like 40 to 50. However- I'm sorry. I thought he said that there were 40 people that were arrested, but that most of those folks that were arrested were let go and then only the four or five remained. That is what he actually stated in order to try to reconcile those inconsistencies when he was confronted. Well, in order to explain- Why would that be-oh, go ahead. I'm just picking you up on your saying to reconcile the inconsistencies, but I'm kind of going along with Judge Christensen, maybe simply to explain what he meant. Perhaps he had-but the question is whether or not that explanation was compelling because the agency is not required to accept a plausible explanation if there are other plausible explanations. And in this case, there certainly is a plausible explanation that this was an inconsistency, and that is my time. Could we have her talk about the circumstances surrounding the murder of the son? Yes. As long as we're asking your questions, you get to stand. Okay, okay. All right. Well, so I just did want to clarify one thing about the son's death because it did come up during my colleague's time, which is that he, during his testimony, said on page 214, you pointed out that passage where he said, oh, wait, actually, it wasn't me who found it, and it was within the same paragraph. Say, oh, wait. You said, oh, wait. Well, sorry. So page 214. I'm sorry. Yeah, you're right. I was- Yeah, you were summarizing. Yes. So the inconsistency was not between that statement and his later statements. The inconsistency was between his narrative statement in which he specifically stated, I took my son's body to the hospital. That's in his narrative statement. And then we have here that he doesn't see his son's body until much later. So that's the inconsistency. So hang on a second. He says he took him to the hospital, but give me again the inconsistency. That's in the narrative. Not the narrative, but where's the inconsistency between the narrative and his testimony? The narrative states that he took his son's body to the hospital, whereas his testimony states that he did not see his son's body until he was at the hospital or at the morgue. So give me precisely the testimony you're referring to. Yes. So on page 274, he states that he saw his son for the first time in the morgue. Hang on a second. I'm slow. Okay, I'm now on page 274. He states that the shepherd found Alexander in a ditch, and Petitioner saw him for the first time in the morgue. I'm now reading from his testimony. Or at the hospital, sorry. I saw my body the first time when they brought him up to the hospital. Yes. And the narrative statement says I brought him to the hospital. Yes. Got it, okay. So this is significant, especially since Petitioner states that the basis of his claim is that he fears that if he goes back to Georgia, he is going to do whatever it takes in order to find out exactly what happened to his son, and that the police will persecute him because of this. So since this is so central to his claim, it goes straight to the heart of the matter. And so it was an appropriate basis for the agency to rely upon when finding that he was not credible. So with that, we'd ask that this Court deny the petition for review. Okay. Let's hear a response from the other side. Well, as the last time, we took the government over. Let's put two and a half minutes on the clock. Thank you, Your Honor. Your Honor, I'll be quick on this matter. Your Honor, yes, the government discussed the same discrepancies that we discussed, but we still believe that none of them in any way enhance his claim. Okay, where he found his son or where he first saw his son, whether there were 40 people arrested or 50 or 5, it doesn't make any real difference. It does not enhance his claim. There may be inconsistencies. It does make a difference whether he, in fact, was giving a speech or whether he didn't give a speech. So he says in his testimony, I gave a speech like everybody else for five minutes, and in the narrative he talks about speeches given by so-and-so and others, including his son, not mentioning himself. I think that does make a difference. Well, but he does go on and explain what happened, which I read it to you. He does explain that I do give speeches. I go everywhere and I do that, you know. But that's pretty vague. He just says I'm always talking to everybody. Yeah, but also in his statement, he says I gave a statement. He didn't say I had a speech, it seems to me, you see. So translation may have lost some of the meaning of the words or have changed the meaning of the words, you see. It's not very clear. Unfortunately, nobody except him spoke the language the translator was able to translate. We don't know exactly what was translated, whether the correct words were used or not. I'm not saying because of that every case has to be. I'm very sympathetic to the translation claim. Particularly it has to go through two layers, but even one, the nuance of the words, whether somebody was beaten or whether someone was slapped, whether someone was arrested or someone was detained, all those are words that can slip around in translation. I get that. But as he's talking about the speech, when he's talking about it more specifically under questioning, it sounds as though it wasn't just a statement. He's very specific about saying everybody got five minutes and I got five minutes. All right. The five minutes, that's not going to be a translation difficulty. Well, all right. There may be an inconsistency between what he wrote and what he said in court. But we all know that we may be able to recall something, rewrite it, and when we talk about it, we remember other aspects or other little points that doesn't necessarily make us not credible. You see, Your Honor? And that's why when the judge, again, I'm emphasizing on this, he was present. He saw all the evidence, including his demeanor in court. He said, I tend to believe I'm going to grant this case. And with that, I rest, Your Honor, and I wish that this court and Your Honors will decide the same. Okay. Thank you. Very helpful arguments in this case. Thank you. I appreciate it. The case of Kevlish-Feeley v. Holder is submitted for decision, and we'll take another five-minute recess. Thank you, Your Honor. Have a nice day.
judges: W. Fletcher, Gould, Christensen